Michael MONROE     PLAINTIFF

v.     CIVIL ACTION NO. 3:15-CV-877-CRS

REYNOLDS CONSUMER
PRODUCTS, LLC, et al.     DEFENDANTS

## MEMORANDUM OPINION

### I. Introduction

This case is before the Court on the motion for summary judgment of Defendants Local 155 of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("Local 155") and Rick Rigney, the current president and business agent of Local 155. DN 46. Plaintiff Michael Monroe responded. DN 50. Defendants replied. DN 55. Therefore, this matter is ripe for review. Finding that Monroe was required to exhaust contractually agreed upon remedies—including arbitration—prior to filing suit, the Court will grant the motion for summary judgment.

### II. Legal Standard

A party moving for summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A genuine issue for trial exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Ibid*. In undertaking this analysis,

the Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The party moving for summary judgment bears the burden of establishing the nonexistence of any issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). They can meet this burden by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the . . . presence of a genuine dispute." FED. R. CIV. P. 56(c)(1). This burden can also be met by demonstrating that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III.     Factual Background[1]

Monroe began working as an operator at Reynolds Consumer Products, LLC in Louisville in April 2002. DN 49-1 at 2. He was elevated to the position of shafter and then, in January 2006, to lead shafter. *Ibid*. In those positions, his job duties included transporting metal with forklifts. *Ibid*. In March 2006, while playing softball at a non-work event, Monroe was injured and lost sight in his left eye. *Id*. at 3. Monroe returned to work six months after the accident and continued working at Reynolds as lead shafter. *Ibid*. He remained in that position until his removal (at issue in this case) in August 2014 and ultimately remained at Reynolds until June 2017. *Id.* at 2.

Employees at Reynolds are covered by Local 155, a local union chartered by the United Steelworkers international trade union. Local 155 covers approximately 420 employees at Reynolds and approximately thirty employees at each of two other plants in Louisville. DN 49-2 at 7. Rigney has been the president and business agent for Local 155 since 2012. *Id*. at 6. Before

---

[1] Unless otherwise noted, the recited facts are without dispute.

that, he worked at Reynolds but has been on a leave of absence as he fulfills his duties as president of Local 155. *Id*. at 5.

Reynolds and Local 155 have a collective bargaining agreement (CBA), which includes a mandatory grievance procedure. The grievance procedure is initiated by the filing of a grievance within ten working days of a grievable incident. DN 50-14 at 2. Next, a three-step process requires meetings in an attempt to reach a settlement. *Id*. at 2–3. Step 3 meetings are held more rarely because they require individuals from Reynolds who do not work at the plant to travel here, including Reynolds's Human Resources Manager from Richmond, Virginia. DN 49-5 at 34. As a result, scheduling those meetings can take up to seven months or a year. *Ibid*. In a good year, there are four or less Step 3 meetings held. DN 49-3 at 25. Ultimately, if the grievance is not resolved satisfactorily, it is referred for arbitration. DN 50-14 at 4.

On June 25, 2014, Monroe hit a wall with his forklift. DN 49-1 at 8. He was given a written warning and a one-day administrative detention but permitted to return to work as lead shafter. DN 50-3; DN 49-1 at 8. However, two weeks later, Monroe was removed from his position for Reynolds to investigate whether his monocular vision affected his ability to perform the job. DN 49-1 at 8. On August 21, 2014, Monroe was sent to Reynolds's optometrist, Dr. Hayley Woodruff, who concluded that Monroe lacked normal depth perception and could not safely operate mobile equipment. *Ibid*.; DN 50-15; DN 50-16. On August 27, 2014, Monroe was informed he would not be permitted to return to his job using mobile equipment. DN 50-4.

On September 12, 2014, Monroe, with assistance from officers of Local 155, filed a grievance related to the removal from his job. DN 50-19. This was not Monroe's first encounter with the grievance process.[2] However, Monroe alleges that this time he had difficulty reaching

---

[2] Monroe had at least three grievances addressed in conjunction with this litigation. First, in October 2006, Monroe grieved his removal from positions involving mobile equipment due to his monocular vision. DN 50-1 at 5. That

his union representatives, even reaching out to the Human Resources department at Reynolds, who forwarded the message to Rigney. DN 50-10; DN 49-2 at 45. While technically untimely filed (more than 10 days after his removal), Reynolds did not reject the grievance and it was processed accordingly.

To prepare for the grievance process, Monroe sought out Dr. Joern Soltau, an ophthalmologist, for a second opinion. Dr. Soltau opined in a letter dated September 23, 2014, that Monroe had sufficient vision to continue operating mobile equipment. DN 50-21. That letter was not provided to the union representatives in time for the Step 1 grievance meeting on October 10, 2014. DN 49-1 at 12; DN 49-2 at 23. With no new evidence, Reynolds declined to change its position. DN 50-20. At some point afterward, Dr. Soltau's letter was provided to the union representatives, who provided it to Reynolds on October 30, 2014. DN 50-5 at 3. On November 18, 2014, Rigney waived the Step 2 hearing, saying they had no new facts to present. DN 50-22. Reynolds considered Dr. Soltau's opinion but determined that it was "not as detailed as the analysis given by Dr. Woodruff" and denied the grievance at Step 2. DN 50-5 at 3.

The Step 3 meeting was scheduled for April 15, 2015. However, Reynolds requested that the Step 3 meeting be held in abeyance pending the resolution of a charge of discrimination filed by Monroe with the Equal Employment Opportunity Commission (EEOC). DN 49-2 at 27. This was the first the union representatives had heard of the EEOC charge, despite the fact that it had

---

grievance was settled with Monroe back in his position so long as he agreed to wear safety glasses, get annual eye tests, and drop discrimination charges. DN 50-1 at 3. Second, in January 2014, Monroe was given a verbal warning related to a scratch on his forklift. DN 50-6. Local 155 filed a class action grievance on behalf of all employees who were disciplined for scratches on forklifts. DN 49-2 at 41–42; DN 49-5 at 21. After a settlement, those discipline records were removed and backpay was issued. DN 50-8; DN 49-2 at 42; DN 49-5 at 22. However, the settlement did not explicitly include Monroe because, by that point, the verbal warning had fallen off Monroe's record. DN 50-8 at 3; DN 49-2 at 42. Third, in January 2015, Monroe had applied for the position of annealing furnace operator. He was rejected due to his monocular vision. DN 49-1 at 13; DN 49-2 at 35; DN 49-3 at 45–46. A grievance related to that issue was filed in March 2016. However, pursuant to the CBA, Reynolds declined to consider the grievance, as it was untimely. DN 50-25.

been filed on September 23, 2014—the same day of Dr. Soltau's opinion letter. DN 50-28. According to the union representatives, holding a grievance in abeyance while there are ongoing administrative proceedings is commonplace. DN 49-2 at 27; DN 49-3 at 53. Monroe alleges that he was not asked and did not consent to hold his grievance in abeyance. DN 49-1 at 15. The others dispute that. DN 49-2 at 28; DN 49-3 at 21; DN 49-5 at 24.

Monroe eventually withdrew his charge of discrimination on May 5, 2015, and requested a right to sue letter. DN 50-29. He did so, he claims, in the hopes of encouraging Reynolds and Local 155 to move faster with his grievance. However, Monroe did not inform the union representatives that he had withdrawn his charge of discrimination. DN 49-1 at 16; DN 49-2 at 28–29; DN 49-3 at 29. They were not made aware that it had been withdrawn until representatives from Reynolds mentioned it during a meeting in August 2015. DN 49-3 at 29.

On December 14, 2015, Monroe filed this lawsuit against Reynolds, two of its employees, Local 155, and Rigney. DN 1. Even afterward, Local 155 proceeded to request documents from Reynolds relating to Monroe's grievance and continue Step 3 meetings. DN 49-3 at 24, 29–30. Ultimately, on March 15, 2016, Local 155 proposed a settlement where Dr. Woodruff and Dr. Soltau would select a third doctor to evaluate Monroe, with Reynolds paying the bill. DN 50-38. However, that resolution was not acceptable to Monroe or Reynolds. DN 49-3 at 33; DN 50-40 at 2. Another offer was made in September 2016, where Local 155 proposed placing Monroe in the position of annealing furnace operator—the position he had applied for in January 2015 and was denied due to his monocular vision—with backpay and seniority. DN 49-2 at 35; DN 49-3 at 45–46. Reynolds would only agree if Local 155 agreed to indemnify Reynolds if Monroe injured someone at work, an offer Local 155 declined. DN 49-2 at 35; DN 49-3 at 45–46.

With that, Local 155 began the process of preparing for arbitration including making additional requests for documents, DN 50-41, obtaining a list of potential arbitrators from the Federal Mediation and Conciliation Service, DN 50-44, and retaining an attorney, DN 46-8. David Cook, Local 155's retained attorney, participated in the selection of the arbitrator and began communicating with Reynolds's arbitration counsel and Monroe's personal counsel to schedule the arbitration. DN 46-8 at 5–6. This process was ongoing when Monroe withdrew his grievance on July 11, 2017. *Id*. at 6–7; DN 49-1 at 21. Monroe subsequently settled his claims against Reynolds and its employees, who were dismissed with prejudice on August 14, 2017. DN 38; DN 40.

**IV.**     **Discussion**

A union owes a duty of fair representation to all members of the bargaining unit. *Vaca v. Sipes*, 386 U.S. 171, 176–77 (1967). *See also* 29 U.S.C. § 185. This duty extends to a union's handling of an employee's grievance. *Id.* at 186. A breach of that duty occurs "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190 (citations omitted). Put another way, "mere negligence" will not suffice. *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 376 (1990). In undertaking this analysis, the Court is limited to the consideration of conduct which "proximately causes a plaintiff to lose rights he enjoyed under the CBA." *Hughes v. General Motors Corp.*, 162 F. Supp. 2d 832, 833 (S.D. Ohio 2002). *See also Milstead v. Int'l Bhd. of Teamsters, Local 957*, 580 F.2d 232, 237 (6th Cir. 1978) (remand to consider damages incurred "as a proximate result of the Union's breach of its duty of fair representation").

A union member bringing a claim against their union based on the duty of fair representation "must at least attempt to exhaust exclusive grievance and arbitration procedures

6

established by the bargaining agreement." *Vaca*, 386 U.S. at 184 (citing *Republic Steel Corp. v. Maddox*, 379 U.S. 650 (1965)). Monroe argues that the exhaustion requirement is discretionary with the Court. For that proposition, he cites to *Clayton v. UAW*, 451 U.S. 679, 688 (1981). However, *Clayton*'s holding was that "courts have discretion to decide whether to require exhaustion of *internal union procedures*." *Ibid.* (emphasis added). In contrast, "[e]xhaustion of contractual grievance procedures is always required." *Winston v. Gen. Drivers, Local 89*, 93 F.3d 251, 255 (6th Cir. 1996) (citing *Clayton*, 451 U.S. at 686, 689).

No party contends that Monroe exhausted the required procedures. Instead, Monroe argues that his failure to exhaust is excused. Exhaustion of contractual grievance procedures is excused, as relevant here, "by the union's wrongful refusal to process the grievance," *Vaca*, 386 U.S. at 185, or "where the effort to proceed formally with contractual or administrative remedies would be wholly futile," *Glover v. St. Louis-San Francisco Railway Company*, 393 U.S. 324, 330 (1969). As to the first category, the ignoring or perfunctory processing of a grievance violates the duty of fair representation. *Vaca*, 386 U.S. at 194. However, mere delay is insufficient. *Ryan v. General Motors Corp.*, 929 F.2d 1105, 1109 (6th Cir. 1989). As to the second category, there must be a "clear and positive showing" of futility. *Wilson v. Int'l Bhd. of Teamsters*, 83 F.3d 747, 753 (6th Cir. 1996). This is a higher standard than what is required for success on the substantive breach of duty claim. *Ibid.* (finding that the showing necessary to establish a breach of the union's duty of fair representation "does not establish hostility such that plaintiffs may now be excused from having failed to pursue available contractual grievance procedures"). A clear and positive showing of futility requires more than just a subjective belief of futility on the part of a plaintiff. *Terwilliger v. Greyhound Lines, Inc.*, 882 F.2d 1033, 1039 (6th Cir. 1989).

7

Here, the terms of the CBA require three steps of attempted resolution followed by arbitration. During Monroe's grievance procedure, Local 155 was consistently working with Monroe to resolve the grievance by holding meetings, conducting investigations, and working on proposals for resolution. Monroe, rather than follow through with the arbitration which was already being scheduled, withdrew his grievance. When a grievance is processed all the way to arbitration, it is a clear indicator that the company did not wrongfully refuse to process the grievance. *Kaiser v. U.S. Postal Serv.*, 908 F.2d 47, 49–50 (6th Cir. 1990) ("the fact that appellant's grievance was processed and arbitration was held belies his assertion that the union wrongfully refused to process his grievance"). *See also Bagsby v. Lewis Bros., Inc. of Tenn.*, 820 F.2d 799, 805 (6th Cir. 1987) (Ryan, J., concurring) (finding lack of exhaustion when employee withdrew grievance prior to arbitration).

To the extent that Monroe claims there was delay, it is merely that and is insufficient, standing alone, to excuse compliance with the CBA procedures. *Ryan*, 929 F.2d at 1109. The facts simply do not indicate that Local 155 was behaving in a dilatory or perfunctory way. Further, some of the delay in the process was caused by Monroe.[3] Reynolds had requested that the grievance be held in abeyance pending EEOC procedures. Both Local 155 and Reynolds believed that waiting for the EEOC process would be beneficial. This reasonable and routinely granted request would not, in and of itself, have produced substantial delay. However, when Monroe withdrew his EEOC charge, he did not notify the union representatives or Reynolds. As a result, any resulting delay is not attributable to Reynolds or Local 155. *See Martinez*, 825 F.2d

---

[3] Monroe argues that he did not consent to hold his grievance in abeyance pending action by the EEOC. Regardless, Monroe's consent was likely not required, particularly given the reasonableness and temporariness of the demands made by Reynolds. *See e.g. Martinez v. Frederick & Herrud, Inc.*, 825 F.2d 411, at *2 (Table) (6th Cir. 1987) (employer unilaterally held grievance in abeyance); *Kaiser*, 908 F.2d at 49 (no violation when "most, if not all, of the delay was caused by appellant's unwillingness to comply with the union's demand that it be furnished with original documents").

411, at *2 (finding duty of fair representation claim "without merit" when plaintiff did not notify his union of the outcome of a related workers' compensation action).

Monroe also urges that exhaustion would be futile because he would be provided with a delayed and incomplete remedy. However, for the same reasons as discussed above, Monroe's failure to exhaust cannot be excused based on futility. Monroe is required by the Labor Management Relations Act to exhaust contractually agreed upon remedies. Nothing in this case provides a clear and positive showing that requiring Monroe's compliance with those procedures would have been futile other than his own assertions or subjective beliefs, which are insufficient to excuse his failure to exhaust. Further, Monroe should have known that the process might not be futile because he had filed previous complaints which were promptly grieved with positive results. Taken as a whole, it is clear that Monroe failed to adequately participate in the grievance and arbitration process before filing suit and Local 155 is entitled to summary judgment.

V.      **Conclusion**

The Supreme Court has instructed that, absent certain extreme circumstances, provisions contained for dispute resolution in collective bargaining agreements are to be followed:

> Collective-bargaining contracts, however, generally contain procedures for the settlement of disputes through mutual discussion and arbitration. These provisions are among those which are to be enforced under § 301[ of the Labor Management Relations Act, codified at 29 U.S.C. § 185]. Furthermore, Congress has specified . . . that final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes. This congressional policy can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play. Courts are not to usurp those functions which collective-bargaining contracts have properly entrusted to the arbitration tribunal.

*Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562–63 (1976) (internal citations and quotations omitted). Here, the facts simply do not indicate that Local 155 wrongfully refused to process Monroe's grievance or that the requirement of arbitration would be wholly futile. As a

result, Monroe should have been required to proceed through the agreed-upon process before litigating. Therefore, the Court will grant the motion for summary judgment.

A separate order will be entered in accordance with this opinion.

February 26, 2019

**Charles R. Simpson III, Senior Judge  
United States District Court**